MR. MORRIS Good morning, my name is Robert Morris and I represent Dr. David Rodin. When Congress enacted the ADA Amendments Act, it made two things absolutely clear. One is that the courts had got it wrong when interpreting Congress' intent as to what the word disability means. And the other thing is that Congress intended that the act provide broad coverage for people with impairments. In this case, the district court found that Dr. David Rodin had an impaired memory and found that that impairment affected the major life activity of taking the board examination, which he failed so many times. MR. TAYLOR Could we clear up a matter that has come up as something of recent controversy with the supplemental briefing, and that is the question as to whether Dr. Rodin had a learning disability. I have understood from the start, from your blue brief, and in fact from your position before the district court, that to the contrary, Dr. Rodin did not have a learning disability. MR. RODIN In the early filings, in the 12B6 motion, as I think what you are referring to, actually the parties took opposite positions from what they are taking now. The board took the position that the... MR. TAYLOR Sounds like a case for judicial estoppel. MR. RODIN The board took the position that Section B3 of the regulations promulgated by the Department of Justice did apply, and that therefore they did not have to offer accommodations if that would fundamentally alter what they were testing. We took the position, and our next sentence kind of backtracked a little bit from that in that brief that you are referring to. We took the position that it did not apply because this was not the type of impairment that was incorporated into the rule. MS. MCCARTY I think Judge Smith was asking a different question. One is, and I had the same impression as well, that there was never an argument that there was a learning disability. The argument was it was an inefficient memory, which was the impairment. And the second point, which we all are curious about, is this difference in a position. So unless I am misunderstanding... MR. RODIN In fact, as Mr. Morris has indicated, I think that in the district court, the parties took different positions. I understood that the response to the board's motion to dismiss from your client said explicitly, Dr. Rodin does not have impaired sensory, manual, or speaking skills. MR. MCCARTY Correct. We did write that in that brief, and the positions have changed. That's correct. The board was taking the position that he did, and it's correct that the positions changed at the time of trial and have changed before you here today. As to Judge Schwartz's question as to whether that constitutes a learning disability, and I'll talk about the sensory impairment in a moment, but it seems self-evident to me, and maybe it's just me, that if someone has a visual memory impairment, and that's how the psychologist referred to it when he got on the stand, and that's partly why we changed our position. He also said that he has a visual retrieval impairment. MR. RODIN It's a cognitive memory impairment, isn't it? MR. MCCARTY Correct. MR. RODIN It's the ability or inability to call up information or data that is in memory. MR. MCCARTY Correct. That's correct. MR. RODIN So how is that a learning disability? MR. MCCARTY If an individual has difficulty calling up the memories that he's formed in his brain, it seems evident that that would cause a learning impairment, and that's our position at this point. As to whether it's necessary to have a sensory impairment, and I'll talk about that in a moment, in order to be covered under the Best and Sure test in B3, Congress didn't distinguish as to what types of disabilities must be accommodated when giving a test. Congress said that the testing entity shall make its test accessible to people with disabilities, and didn't distinguish between learning disabilities and other disabilities. The regulation issued by the Department of Justice does limit it to sensory disabilities. It doesn't say sensory disabilities. It says sensory skills, and I pointed that out in my letter brief last week, that I think there's an important distinction between an impairment of a sensory organ, like the eyes. If he had lost an eye, that would be an impairment of a sensory organ. It talks about, in the regulation, sensory skills, and in order to exercise the eyes later, from visual cues, you have to have what I would call sensory skills, visual skills, and that's exactly what was impaired. In the report of Dr. Slap Shelton, which I quoted in my brief last week, she said that what he has a difficulty with, and Dr. Moss elaborated on this at trial, she said that he has difficulty acquiring the memories visually, and that wasn't the real problem with the test, because he has acquired the memories, and he has the fund of knowledge. What she went on to say is that then he has trouble cueing those memories from visual cues, the words on a page, and Dr. Moss elaborated on that. That's where he talked about the declarative memory and the procedural memories, and I think, and apparently I didn't make it clear enough, but it's the use of his eyes. Maybe it's just a hurdle that is extremely difficult to overcome. So we don't spend all the argument time on that issue, because there are numerous other issues here. Could we focus for a bit on the discussion about the gap between verbal IQ and performance IQ? In particular, I would be interested in knowing how that reflects a memory impairment. Well, apparently, what the psychologist found on the test, and I again direct you to Dr. Moss' testimony, what he said is that these impairments... And Dr. Moss is the expert for Dr. Rodden, who really didn't have any experience with the test in question. No, no, Dr. Golden is the one that didn't have experience. Dr. Moss is a neuropsychologist, same specialty as Dr. Slapshelton, who conducted the tests, and Dr. Moss does conduct tests. No, the test, the board certification test. Oh, I misunderstood. I apologize. Because there were questions asked relative to familiarity with the examination itself. That's correct. He didn't know specifically what questions are asked on the test, or exactly how they're phrased. What he said is that he has difficulty when there is no context or limited context. What Dr. Rodden testified to, and I pointed this out in my brief last week, Dr. Rodden said that when I'm there, if I just see the words on the page, that doesn't jog my memory. But when I'm in a live session, I think it is, Your Honor. That's a context. For him, that's the kind of context that he needs. He needs other than visual cues. Some of these questions, however, contain visual cues, didn't they? Didn't some of the questions in the examination include pictures? That contextualizes the inquiry, doesn't it? And that's some help, but what he needs, if you look at his testimony, he needs to be in the room, to feel the room, feel the patient, see the patient, get feedback. And how would an essay test help him? Because one of the proposed alternatives that was not granted was an essay test. Actually, that was one thing that was proposed by Dr. Slapshelton, and in an essay, he can start getting words out on a paper. It's not just seeing it. How is that different? I have trouble understanding. How is that different, him getting words out, than seeing words on the paper? It may not, but one of the other things that Dr. Slapshelton recommended is an open book test, and the evidence on that was that what he can do is he can begin to start the thought process by... How does that contextualize? I mean, I understood you to be saying that the contextualization he wants is essentially a clinical one, but an open book isn't going to provide any indicia, is it, of a clinical context? It may not, but Dr. Slapshelton felt, based on her tests, that that would provide enough context for him to begin jogging his memory about the principles that are being tested. What they're testing is fundamental knowledge on pediatrics. By the way, what is the major life activity here? Is it test-taking, or is it standardized test-taking, or multiple-choice test-taking? We took the position that... The test-taking is specifically the type of test that's offered by the Board of Pediatrics. That's what we're saying was a major life activity for him, because it's so important in his profession to have the board certification. With regard to whether or not the accommodations that he was asking were appropriate, the one that he asked for, and he was questioned by both me and the court at trial, he said... We asked him, is there some way that you can be tested on this fund of knowledge that you obviously have in pediatrics, because you're an exemplary pediatrician? He said that what you can do is send somebody on rounds with me and ask me questions there, essentially. That would provide him the context that he needs. As to whether or not that could be done, what we're suggesting is that all they need to do is have one of those people that, on the board, they're all board-certified pediatricians, have one or two or three or however many people that you want come out on rounds with me at the children's hospital, ask me questions about how I arrive at my diagnosis, ask me questions about what are the appropriate tests to narrow down the diagnosis, what are the less time-sensitive situations, ask me the questions about how I am doing this, how am I practicing so well as a pediatrician? I obviously have the knowledge. But that would only be as good as the episodes in the presence of the people as they're happening, and as I understand the evidence, the board takes the position that the way they test allows a broad spectrum of subject areas, so how would that not result in a fundamental alteration, assuming that that was one offered to the board to consider, which I'm gathering it really wasn't. They could even ask other questions about, suppose the patient's symptoms were different. But another thing that was addressed at trial was the question of whether or not vignettes could be used, because that's what the U.S. MLE is going to. They're getting away from the multiple-choice tests, and they're getting into offering vignettes. Why don't you explain, for my benefit, the difference between a vignette and the type of questions in here, where there are a vignette or a contextual hypothetical given for the answer. A vignette could be either live or taped, and in a vignette, if it were live, he could have the opportunity, I mean, this is a fake situation, it's not real life, but... What do you mean, like a role-play?  You're talking about a role-play. Role-play, exactly. He could have the opportunity to get more feedback. If he says that that particular symptom, can you give me more information about it, he could kill his memory. That really is a fundamental alteration of the exam, isn't it? I don't think so. I think that it would be a simple thing. They've got a bank of 4,500 questions that have already been psychometric. Is there anything in the record about the cost of such an alteration? There is something in the record about what it cost them to vet all of these questions, and it's about $3,500 a question. Is there anything about the cost of the specific alteration that you're suggesting? No. There wasn't anything about that specific cost. Let me ask you a question on another issue here, if I may. At the beginning of your presentation you were referring to what Congress intended and did by way of the amendments offered through the ADAAA. I believe I'm correct in stating that under the ADA, at least, what we were talking about was making a comparison to most people in the general population. Is there anything in the amendments that have changed that requirement in any way, such that the comparison of IQ or comparison of the very phenomenon that's being discussed here, and that is verbal IQ versus performance IQ, is there anything in those amendments to suggest that that comparison has been changed in any way? I don't think, there's certainly nothing specific. The one thing that Congress said is that the question of whether someone with an impairment has a disability should not require extensive analysis. And the EEOC actually anticipated this question. What I would say is that most people in the general population certainly don't have the impairment that Dr. Rodden has. But your client has an IQ that is at least average or above average or performance here to the general population, right? Correct. But it's the difference in levels between his IQ and his performance. His general IQ, his raw IQ, and his performance IQ. Are you saying that's his impairment? I thought you said his impairment was his inefficient memory. Doesn't the differential that's been identified between the IQ and the memory testing demonstrate that he has an impairment? But that's not what you're saying he's disabled by. It's his memory, isn't it? It is his memory. It's his visual memory. He can, as I pointed out in my letter brief, people can acquire information. Visual memory? What is a visual memory? It's seeing things and forming the memory from what you see on the page. In other words, reading or seeing a picture, you get information from it. There's nothing ocular about the process of recall, is there? It's at the other end of the visual pathway. Not the eye, not the optic nerve, but where the optic nerve is received, where the receptors are in the brain, in the sensorium. That's what's impaired. It is part of the ability to form visual memories. It's a visual skill. I would say that the brain is a sensory organ. I just want to go back and make sure that I understand that. The record seems to reflect that his memory is within the normal area, within average, correct? As compared to the general population, is that correct? As compared to, well, it's a, may I? No, go ahead. These are diagnostic tests. Let me give you an example. We should all at our annual physical be testing our serum cholesterol. The normal range right now goes up to 160. At one time it was 200. It was supposed to be under 160. However, if your cholesterol goes up from say 100 to 155 and you're having chest pains, the symptoms are that you're having chest pains and shortness of breath when walking up steps, your doctor is going to diagnose that you have some buildup on your coronary arteries from the cholesterol. Just because it's normal, it's acute. It doesn't mean that just because it's normal, he doesn't have an impairment. He has an impairment. The way neuropsychologists do this test is they see just what the difference is between your raw IQ and other tests. But what makes it difficult for him to perform on the test? The memory issue or the difference between the IQ and the memory? Isn't it the memory issue? It's the memory issue, yes. So wouldn't that be the disabling condition that we'd be focused on? Absolutely. And the judge found that he had a memory impairment and that impaired his ability to take multiple choice tests. I'd like to just point out, and we did this in our brief, that EEOC, when it issued its regulations to implement the Amendments Act, actually anticipated this. That's in the Federal Register that I cited, 76th Federal Register. Mr. Morris, we have already given you well over three times the amount of your requested five minutes since you've permitted Amici to participate. So we will have you back on rebuttal, but we will hold Amici to the amount of time allotted. Thank you for your indulgence. Thank you very much. Mr. Han. Good morning, Your Honors. My name is Simon Han. I represent Amici Public Interest Organizations. I'm here to address two points, and two points that Your Honors have already touched upon in this oral argument. The first is the question of whether or not Dr. Rodden has a learning disability. Now, we believe that Dr. Rodden absolutely has a learning disability. The District Court found that he has a mental impairment that affects his ability to remember discrete and unrelated information. Now, the ADA doesn't provide specific definitions for different kinds of disabilities, but under any definition, the ability to remember information has to be a part of the ability to learn. The second thing that I want to say about learning disabilities is that the Board's argument that Dr. Rodden does not have a learning disability is based entirely on the DSM-IV, the Diagnostic and Statistical Manual of Mental Disorders. But the DSM, even if it supported the Board's position, doesn't define what categories of disability are under the ADA. And the final thing that I want to say about learning disabilities is that regardless of whether we call Dr. Rodden's impairment a learning disability or a cognitive disorder, it does not matter in terms of whether he has a disability under the ADA. Under the ADA, an individual has a disability if he or she has an impairment that substantially affects a major life activity. It doesn't matter what the diagnostic code that's given to the impairment actually is. But doesn't the best-insured standard only apply if the person's disability impairs a sensory manual or speaking skill? Well, yes, Your Honor. How is that this? Well, going back to what Mr. Morris said, the best-insured... And how do you address the fact that plaintiff in the district court has explicitly said that is not this? Well, to the extent that they said that, Your Honor, we disagree with that position. You disagree with the plaintiff as to what condition the plaintiff has? Well, we disagree that it's not a learning disability. I must say it's the first time I've ever heard an amicus take that position. Your Honor, our position is that he does have a learning disability and he has one from the start, but that the reason why the terms that we sometimes use for his impairment are different is because of the fact that whether his impairment is a learning disability or cognitive disorder doesn't matter as to whether he has a disability under the ADA. But it does matter as to whether the best-insured standard applies, what the nature of that impairment is. Yes, Your Honor. And again, he has had a learning disability from the start and learning disability is specifically mentioned in the DOJ's regulations as a type of sensory skill disability. Let me spot you your position that best-insured applies. Do you take the position then as part and parcel of that that we must read reasonableness completely out of the equation? Well, Your Honor, I think that the best-insured standard is a higher standard than a reasonable accommodation. I don't think that answers my question. So to make sure I understand your question correctly, Your Honor, you're asking me if the reasonableness standard does not apply for learning disabilities? I probably should reserve that question for the government because that's my understanding of, or at least my understanding of the suggestion they've made here. But I was interested in what your position would be as well. That's all right if you don't want to take such a position. You're not required to. Well, Your Honor, our position is that for a learning disability the best-insured standard does apply and it's not the reasonableness standard. All right. You've actually, because of a mistake made, I think, in the arrangements right before we came in here, you were giving up two minutes of your time. Was that your understanding? Yes, Your Honor, that's correct. So thank you very much. Thank you, Your Honors. We had, I know, instructed that but ended up with five minutes on the clock anyway. So we'll hear from Ms. Eichhorn for the United States. May it please the Court, Jennifer Levin Eichhorn on behalf of the United States. The District Court's assessment of the Board's obligation under Section 309 should be rejected because it was inconsistent with the standard set forth in the regulations and with this Court's precedent. Title III, Section 12189 states that licensing exams such as this must be accessible in the location and manner it is provided. The implementing regulations at 36.309 explain that a testing entity must best ensure that the test measures an applicant's aptitude or achievement and not the impact of the individual's disability. Why doesn't this multiple choice exam fit the bill? Based upon the evidence that was adduced in front of the fact finder. Why doesn't it best, why does this multiple choice test not best ensure a measurement of the fund of knowledge? The question is, we did not take a position with respect to how the facts applied in this case. Our position is that the Court did not apply a best-ensure standard. It applied a reasonable modification standard. So what should the Court have done applying your test? Applying our test, the Court should have evaluated whether or not the testing entity, whether or not the Board fully evaluated alternatives to the format that it, the Board itself, the ADA coordinator said that we provided accommodations that were reasonable. So reasonableness is read out of the equation if best-ensure applies? The best-ensure standard has limitations and it says that the entity must provide an alternative if it can measure results accurately reflect the aptitude or achievement. I don't think that's an answer to my question. It is different from a reasonableness standard. It doesn't mean it doesn't have limits but there are other portions for example of the ADA which have a standard other than reasonableness. The effective communication standard is different from reasonableness. This is really a rather new position that the Department is taking, isn't it? It's not a new position, Your Honor.  since before ENYAR to believe that we in the Jones case we've piled in the District Court and in the Second Circuit and this is the position that's been in our regulations. The board's reference to past settlement agreements settlement agreements are as you know compromises. Have courts not applied reasonable accommodation under Title III for a good many years? They have, Your Honor, but just as So for 20 years they've been wrong in doing that? No. It's not that they've been wrong in every respect. It's been wrong with respect to the testing standard. There have been several cases which have applied the Best & Sure Section 309 standard correctly. That is ENYAR, it's BONNET it's the District Court in Northern California in the Department of Fair Employment case it's with cites to an unpublished opinion called Brimehurst which is also out of California where the court has applied Best & Sure and recognizes that it's different from reasonableness the reasonableness standard The regulations include the reasonable modification standards with respect to auxiliary aids and B3. So it includes the fundamental alteration and the undue burden defenses with respect to auxiliary aids. When you're addressing format it has the standard of whether or not the entity can develop an alternative test that can still measure the applicant's aptitude in the same way it tests others. It might be that I don't think they've ever said they can't. Have they? They have certainly said that there is an enormous cost that goes to developing this test and therefore there would be a considerable cost to attend any change of the kind you're suggesting would be required by such an accommodation. Isn't that a reasonableness consideration? I frankly would just use a different term to say that cost at some point can become a defense here. I'd say here the evidence is extremely limited with respect to how cost plays a role. Well, at least to the extent there's evidence there is evidence that has been put in by the board. There's been no evidence put in by the plaintiff appellant, has there? Again, Your Honor, I'm not saying which party wins, but what we're saying is that the court did not apply the correct standard. It's pretty difficult to take that position and not suggest which party wins. Your Honor, frankly, the United States says this on a frequent basis where we say that this is a standard that needs to apply and on remand. I just have one quick question. Is it the government's position that the best and sure standard applies to any testing regardless of the nature of the impairment? Your Honor, we're not in a position to address your request for a supplemental briefing at this time. I understand. That makes it very difficult, though, when I'm looking at a regulation that talks about three types of impairments. Your Honor, I appreciate your frustration, but our policy is in practice on him because it's different from our party. We'll hear from Mr. Sullivan for the board. My name is Chris Sullivan here on behalf of the American Board of Pediatrics. Judges, there are three independent grounds to uphold the lower court. One is that he's not disabled, though impaired, under the ADA. The second, and this is where we get sticky, gets to the best and sure standard, but it's the board's position that the denied accommodations do not amount to discrimination even under the best and sure standard which we do not think applies, nor do we think is a legal standard, but do not amount to discrimination because as the lower court found and the bonnet court analyzed that did apply the best and sure standard, there has to be a necessity, a nexus, a factual link between the impairments and the accommodations requested, and what the lower court found based on the impairments as defined by the plaintiff that the exam was the exact right sort of exam to accommodate those impairments. In other words, there was no nexus, or as the district court said, no necessity. And I can get into that in some depth but what we would argue is if this court thinks the best and sure standard is a new legal standard, and if it thinks it should have been applied by the district court, still the district court's decision should be upheld because in essence he did that, the lower court did that, but not finding the nexus between the need, the necessity, and the denied accommodations. Your position is the district court did not apply the best and sure standard? Our position is it did not technically apply the best and sure standard, nor should it have. Excuse me? Why shouldn't it have? First of all, we don't believe that it is an actual standard. We believe it's delimiting guidance in that listen, best and sure linguistically can mean two things. It could mean the exalted, the best, or it could mean, as Bonnet said, and as the Third Circuit said in Mahmood, is that it is equal to or better than its alternatives. You're not saying it's aspirational. Are you saying that a regulation that the Department of Justice issued in the CFR is an aspiration? No, not aspirational. It is guidance. It is guidance just like there is guidance all throughout the regulations and in the step-by-step analysis of those regulations which we've gone through in our briefs. Are you distinguishing something that's guidance versus something with the force of law? Yes. Well, not quite. It has the force of law, but it is not a legal standard that Title III courts have to adopt in analyzing whether there's liability under the ADA. That's what I'm distinguishing. So what's the purpose of it, if it's not something courts are supposed to apply? The purpose of it would be, quite frankly, in our view and what we think the purpose was since 1992, and forget about settlement agreements. We've got an interpretive letter by the Department of Justice since 1992, unchanged by the amendments, even though they reenacted the regulations they could have changed this language. They didn't. But our interpretation of it and I think how it's been applied. Let me get to your question one second as a side. The other thing is nowhere in the Bonnet case or in the regulations does applying a best-insured linguistically or legally or logically mean you have to read out reasonableness. So getting back to your question Judge Schwartz, what our view is and how it's been interpreted before is that exam providers can't game the system by providing a reasonable accommodation that is completely unsuited to the situation. For instance, everyone agrees that braille is a reasonable accommodation. It is not to somebody who doesn't read braille. And that's what we think this guidance is. Whether you want to call it a standard or a heightened standard, that's fine because we do agree that exam providers cannot game the system by just offering reasonable accommodations that have no nexus to the impairments at issue. But even if you apply this legal standard, which would be the first time for this circuit and would only be the third jurisdiction only the Ninth Circuit, limited to California and the D.C. has adopted a new legal standard of best insured. Even if you adopt this as a legal standard, it does not mean that reasonableness is read out of it. In fact, this would be the first time. It would be tantamount to strict liability only for exam providers and course providers, but only for exam providers. And what component of it are we applying this reasonableness prism of the best insured standard? What part is being evaluated? Whether the exam provider was reasonable in the accommodation it was willing to give? Can you just explain what it modifies? Yeah. I don't think it's the action by the provider. It's the accommodation itself is reasonable. In other words, best insured I think as Bonnet defined it. And quite frankly even though not adopted by the Third Circuit I think the Mahmood Court gave the clearest boundaries. Nobody has defined what this so-called standard means. They didn't today. They didn't in their briefs. No court and our elder Bonnet has defined what this blasted thing means. And if you guys adopted, please define it. But what it means is from the Mahmood Court and the Bonnet Court is that amongst reasonable accommodations you are to provide the one that best insures or is the best or equal to the best as far as best being effective for that given context and factual nexus. That's what we think at the maximum the so-called standard means. And let me get back to why it doesn't necessarily, in fact I think on the surface doesn't read out reasonableness. Everyone agrees that if best insured applies, there's a carve out for fundamental alteration and undue burden. How do you go through a fundamental alteration analysis and an undue burden analysis without some sort of reasonableness analysis? What difference would it make if it was unduly burdensome if reasonableness is not to be analyzed? It doesn't make any sense. So there are three underpinning grounds. No disability under the ADA. Impairment, yes, no disability. Now, on the disability point and on the discrepancy analysis and the learning disability, first of all, there's more than the DSM-IV to say that he wasn't learning disabled. The plaintiff never took the position, was never diagnosed, no expert ever testified that he had a learning disability. In addition, at the record, my eyes are getting bad, judges, JA-63 is his application for accommodations to the ABP. And there you can check off boxes, one of which includes learning disability. He didn't check it off. Maybe he's got a learning disability. But how can we, the American Board of Pediatrics, be charged with not accommodating something that was never asserted? The Shaywitz case out of the Southern District of New York against the American Board of Psychiatry and Neurology, the second case, the summary judgment case, the granted judgment in favor of the board, addresses this point. It says a board or an entity cannot be liable for something that it doesn't have notice of. So regardless of, in the real world, whether he has a learning disability or not, which we say he doesn't under the DSM-IV, which is the Bible for clinical diagnosis, regardless, it was never asserted. So it doesn't matter under the Shaywitz case. The second point, with regard to discrepancy analysis, the case, the Healy case at 870 F. Sepp 2nd, 607, is directly on point and I think provides guidance here, obviously not binding. That was an examinations case. It was against the National Board of Osteopathic Medical Examiners. It was a post-amendments ADA Amendments Act case, so they had a broader, they applied a broader interpretation for disability. In it, the litigant there went through the exact same battery, only once rather than twice here, exact same battery of neuropsychological testing. Same ones, WAIS-III, WMB, all of these things. And, like here, in each and every one of those 70 plus tests and subtests, he scored average to low average. Dr. Run scored in the low average, but average ran in one of those 70 tests. And what the court said, and the litigant pushed the discrepancy analysis, and the court said, and I'm quoting, a person may exhibit statistically significant variation in test scores, sufficient to support a clinical diagnosis, but this diagnosis is based on an internal referent. When the test scores are compared to an external referent, as the ADA requires, that is the general population, the person may nevertheless exhibit average abilities. And that's what you're saying happened here, that there might have been intrapersonal differences in performance, but as compared to the core issue here on the memory, from your point of view, he's still within the general population. Averages, that's absolutely correct, Judge. And, the trump card, so to speak, is that even post amendments, the regulations are perfectly clear that a comparison to the general population is still necessary to rise in impairment to a disability for the ADA. How do you respond to your adversary's July 3rd description of this visual memory becoming a sensory issue and thereby being covered by the best insurers? I think we covered that in our supplemental briefing. Excuse me, Judge. You had a chance to, your position is locked in your written, you had a chance to see it before you submitted it. Here would be my response. I'm not a doctor. I'm just a thinker, so I would hope. The way that they are now defining what is a sensory impairment as something that is not the five senses, but is cognitive in function, would mean that every impairment is a sensory impairment because we're all sentient beings. And, for whatever it's worth, I disagree with that. But I'm not a doctor. But I would point out that not only did they state this in their brief, that he doesn't have such impairments. And the board did not change its position on this, by the way. It has to do with whether or not fundamental alteration applies. We never took the position that he had a learning disability or impairment to his sensory skills. Never took that position. But in addition to what they put in the record here on appeal and under Rule 11 submitted to the district court, we've got the testimony of Dr. Rodden, which I won't go through because I can't read it without my reading glasses, but we put that in our supplemental brief. Let me go to why... Let me take a shot at why we don't think there is a legal standard. There's no legal standard? Why best insured is not a new legal standard. And I want to add this on to everything that we've already discussed. Prior to around 2011, and this has been intimated already, the DOJ's position on 36-309 was that it provided reasonable accommodations. That was until Enyarn. And the DOJ's have adopted the best insured standard all post Enyarn. All limited to California, 9th Circuit, and the Bonnet case in D.C. 20 years of cases, 20 years of Department of Justice regulations have always said within the 36-309 context that reasonableness is part of the analysis. Only in 2011 does the Department of Justice review, respectfully, changes interpretation. Now they do this on the heels of the Amendments Act where new regulations come out in 2010 and subsection 36-309 is unaltered. Not one iota. Not changed one bit. Now they could have. They reissued all of the regulations pursuant to notice of rulemaking to a comment period. They didn't attempt to change that regulation. In our view, they're going against the prior 20 years of the Department of Justice's view and changing a regulation without notice, without a comment period. And for that, we don't think there should be any deference. When you pile on top of that, that nobody has been able to come up with a definition of what the best insured legal standard means. Other than a tautology, it means to best insure. We don't believe that this is a legal standard that should be adopted by this court. If anything, it should be an edict to a reasonableness standard that says, listen, you can't get out of liability for the ADA simply by offering a reasonable accommodation. It has to be a reasonable accommodation. And finally, I'd close with my final 10 seconds, is that as a district court found, and there is in the record the cost of an alternative exam. I believe it's at JA 380 and it was millions of dollars, but it's in the record. There was testimony to that. And as the court found, it was uncontested testimony, both factually and expert testimony by the ABP, uncontested, that the denied accommodations not only fundamentally altered the exam, but were unduly burdensome. And we have the sites to those in the record in our briefs and invite you to go and look at that record. Thank you, judges. Thank you, Mr. Sullivan. Mr. Morris, you have two minutes of rebuttal. Briefly, Your Honor, I disagree with my colleague that learning is not a sensory skill. We say it is. If you can imagine a human being without the use of any of his senses, sight, hearing, touch, smell, and never had those senses, learning is impossible. I'd like to answer the question from the court about whether reasonableness is read out of the equation. And my response to that is that Congress actually used the words reasonable accommodation in Title I. It did not use the words reasonable accommodation in Title III. Title III, in 1-2-1-8-9, Congress used the word that the words, or the phrase that the testing entities shall make their tests accessible. In implementing that part of the Act, the DOJ didn't use the word reasonable. They used the word best ensured. Your Honor, ask the question whether that means reasonableness is read out of it. I say it is. What they substituted instead is that it's not necessary if it creates... And where is there a limiting principle? That's what I was about to say, Your Honor. The limiting principle is they don't have to make it accessible if it's an undue burden. That's what the regulation says. That's the limiting principle. As to whether or not this test, this multiple choice test, best ensured, or whether the Board best assured that Dr. Rodden's disability was accommodated, what happened, what the evidence is, is that that application that my colleague was talking about where the boxes checked off was accompanied by a 12-page report from a neuropsychologist that described in detail what his impairment was. It wasn't just an application with boxes checked off. And that went to Dr. McGinnis who testified that when she received it, she didn't have the qualifications to decide whether or not those were accommodations that were appropriate. She didn't consult with any other consultant. She simply decided that because he had only had three of those accommodations on a test 12 years earlier, the USMLE, that those were the only accommodations they were going to provide. As to whether the multiple choice test best ensures that they're testing his ability, his fund of knowledge of pediatrics, this is an accomplished physician. This is the assistant director of the nursery at CHOP for six and a half years who had a flawless record. He obviously has the fund of knowledge. I submit to you that there has to be a way, and we suggested several, and I think they're appropriate, there has to be a way of testing whether or not he has that ability. There are ways. We talked about having somebody come out and question him in a clinical setting. They could do the questioning in a clinical setting that they established themselves. The board did not offer testimony that was inappropriate. We've given you three minutes. Thank you very much. Thank you to all for a very well-argued presentation and a very complex case. Thank you very much. We'll take the case under advisement.